CREW–LEVICK CO. v. BRITISH & FOREIGN MARINE INS. CO.,
LIMITED, OF LIVERPOOL.

(Circuit Court of Appeals, Third Circuit.   June 19, 1900.)

No. 20.

INSURANCE—CONSTRUCTION OF POLICY—GOODS IN TRANSIT.

A policy of insurance which was in form a marine policy contained a printed provision in which it was stated that the insurance should "continue and endure until said goods and merchandise shall be safely landed at —— as aforesaid." None of the blanks in said provision intended to show the name of the vessel and the ports of shipment and destination were filled. The policy had stamped thereon a statement that the special terms and conditions governing the insurance were set forth in a rider attached, the contents of which should supersede anything to the contrary in the printed body of the policy, and the rider stated the insurance to be upon "oil in tank cars in transit." Held, that the printed provision set out was intended, when properly filled out, to be applicable only to sea carriage, and was no part of the contract made by the policy in question, and that when a tank car of oil, covered by the policy, had been delivered by the railroad which transported it to the insured, by being placed by its direction upon its private siding alongside its warehouse, the oil was no longer "in transit," within the terms of the policy.

Acheson, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

Theodore F. Jenkins, for plaintiff in error.

Henry N. Paul, Jr., for defendant in error.

Before ACHESON and GRAY, Circuit Judges, and BRADFORD, District Judge.

GRAY, Circuit Judge.   This was an action on a policy of insurance, to recover the value of oil destroyed by fire on December 10, 1895, while in tank cars on a siding alongside of the plaintiff's warehouse. The action was brought in the court of common pleas No. 4 of Philadelphia county, and on the application of the defendant was transferred to the circuit court of the United States for the Eastern district of Pennsylvania.   The tank cars containing this oil had been transported (five of them by the Pennsylvania Railroad, and one of them by the Baltimore & Ohio Railroad) from the Pennsylvania oil regions, under six separate bills of lading or contracts of carriage, in each one of which the oil was stated to be consigned to "Crew-Levick Company, Swanson and Jackson streets, Philadelphia."   In detail, the facts, which are wholly undisputed, are these:   At the corner of Swanson and Jackson streets, Philadelphia, the Crew-Levick Company at this time had an oil warehouse, surrounded by quite a yard, inclosed by a fence, containing, besides the warehouse, a cooper shop and some sheds and stables, all belonging to the Crew-Levick Company.   On one side of this yard or inclosed area was Swanson street, along which ran the track of the Pennsylvania Railroad Company, and on the opposite side of the yard ran Meadow street, along which ran the track of the Baltimore & Ohio Railroad, so that the inclosed yard of the plaintiff company was situated directly between the tracks of these two railroad companies.   The private siding of the Crew-Levick Company was situated within this yard, alongside of the oil warehouse.   It connected, through gates in the fence on either side, with both railroads,—on the Swanson street side with the Pennsylvania Railroad, and on the

Meadow street side with the Baltimore & Ohio Railroad. In the regular course of business the Pennsylvania Railroad Company, from its Washington Avenue Station, which is not far from the corner of Swanson and Jackson streets, makes its delivery of car loads of merchandise consigned to its regular customers, who have their own private sidings, by placing the cars containing the merchandise on the customer's private siding, and leaving them there for their customer to unload at his convenience; the railroad company making no charge for the use of the car, unless detained over 48 hours. In the regular course of business, car loads of merchandise arriving at the Washington Avenue Station of the Pennsylvania Railroad, and consigned to any of the customers of the railroad having their private siding, are kept by the railroad company while notice of their arrival is sent by a messenger to the consignee. The consignee, at his convenience, notifies the railroad company when he desires to have what is called "a shift"; that is, when he desires the railroad company to send an engine to remove from the customer's private siding any unloaded cars, and to substitute in their place loaded cars, of the arrival of which notice has been given. Some time on December 9, 1895, the day before the fire, two of the six car loads of oil which were destroyed by the fire had been placed upon the private siding of the Crew-Levick Company at Swanson and Jackson streets, alongside its warehouse; one having been placed there by the Pennsylvania Railroad, and one having been placed there by the Baltimore & Ohio Railroad. The next day, December 10th, at about noon, the two cars just mentioned being still unloaded, the Crew-Levick Company sent word to the Washington Avenue Station of the Pennsylvania Railroad that it wished a shift that afternoon, and gave directions to have four more loaded cars placed upon its siding. As a consequence of these orders, between 4 and 6:15 o'clock of that afternoon the remaining four of the six loaded oil cars were placed on plaintiff's private siding and left there. About 9 o'clock in the evening a fire occurred, which destroyed the warehouse, and with it six of the loaded tank cars, two of which had been left there the day before, and four that afternoon. Of the four others which were on the siding, two were hauled off at the Baltimore & Ohio end, and two at the Pennsylvania Railroad end (including the one which had projected through the gate), and were not burned.

The policy on which the suit is brought is irregular, in that it is a printed marine policy form, with many of the blanks unfilled, and to which is attached a so-called "paster," which contains the substance of the real contract of insurance. A policy framed throughout to express the meaning and intention of the parties would have avoided the difficulties out of which this litigation sprang. The transaction was an unbusinesslike and careless one, and has brought to the parties unnecessary trouble and expense. To arrive at the agreement between the parties to this contract, we are referred to a long printed form, containing a number of blanks, and evidently intended to be used in the writing of marine insurance alone; the defendant being a marine insurance company. This printed policy is, in its ordinary form, and as we have said, was meant to cover exclusively a marine risk, as a perusal will make obvious. It begins as follows:

"(Cargo)                                                    (No. 638,003.)
                              "A.

"The British and Foreign Marine Insurance Company, Limited, of Liverpool.
                        New York Branch.

"Crew-Levick Company,.on account of whom it may concern.
"In case of loss, to be paid in funds current in the United States to them.
"Do make insurance and cause to be insured, lost or not lost, at and from
October 10, 1895, at noon, to October 10, 1896, at noon, as per form attached
herein.
"Upon all kinds of lawful goods and merchandise, laden or to be laden on
board the good ———, whereof ——— is master, for this present voyage, or who-
ever else shall go for master in the said vessel, or by whatever other name or
names the said vessel, or the master thereof, is or shall be named or called.
"Beginning the adventure upon the said goods and merchandise from and im-
mediately following the loading thereon on board of the said vessel at ——— as
aforesaid, and so shall continue and endure until the said goods and mer-
chandise shall be safely landed at ——— as aforesaid. And it shall and may be
lawful for the said vessel, in her voyage, to proceed and sail to, touch and stay
at, any port or places, if thereunto obliged by stress of weather or other un-
avoidable accident, without prejudice to this insurance. The said goods and
merchandise hereby insured are valued at ———, as per form attached herein
———, including premium; such valuation being represented by the assured as
not exceeding invoice cost and ——— per cent. thereof."·

Following this are many printed stipulations defining or limiting
the obligation of the company, most of which are expressly and in
terms applicable to a seaborne cargo.  Only one of these, in addition
to what has already been quoted, is claimed to have any bearing on
this litigation.  It occurs after many printed provisions and condi-
tions of the policy, and is as follows:

"This insurance warranted to be in all cases null and void to the extent of
any insurance with any fire insurance companies directly or indirectly covering
upon the same property, whether prior. or subsequent hereto in date."

The following was stamped in red ink on the face of the policy:

"The special terms and conditions governing this insurance are set, forth in
the contract form which is attached within and signed by L. A. Wight, attor-
ney, and the contents of same· shall supersede anything to the contrary in the
printed body of this policy."

Attached to and forming a part of policy No. 638,003, signed by
L. A. Wight, attorney, the "contract form" hereto referred to is
pasted on the back of the policy, and is as follows:

                                    "New York, October 24, 1895.
"In consideration of $12.50 additional premium, this policy is hereby made to
cover under the following form, and not as heretofore, to wit:
"Crew-Levick Company, for account of whom it may concern.  Loss, if any,
payable to them.
"$2,500.  On oil contained in tank cars in transit, principally from oil re-
gions in Pennsylvania and New York to various places, and to Seaboard Oil
Works, South Chester, Pa., and from Seaboard Oil Works to various places.
"It is the true intent and meaning of this policy to fully indemnify the as-
sured for each and every loss by or in consequence of fire, derailment, or col-
lision, not exceeding, however, the sum hereby insured, anything contained in
the printed conditions of this policy to the contrary notwithstanding.  ·
"$2,500, 1 year from October 10, 1895, at 10 per cent. per annum.  Premium,
$2.50.
"Attached to and forming part of policy No. 638,003, of British and Foreign
Marine Insurance Company, Limited."

The case was submitted to the jury by the learned judge of the court below, with instructions to return a verdict for the plaintiff for the amount claimed, reserving the question as to the points submitted by counsel for the defendant. 98 Fed. 71. The jury rendered a verdict accordingly. The points reserved were as follows:

"(1) Under the evidence in this case the oil which was destroyed by fire, and for which the plaintiff claims to recover, was not 'in transit,' and therefore was not within the terms of the defendant's policy in suit. Consequently your verdict must be for the defendant. (2) The policy in suit provides, 'This insurance warranted to be in all cases null and void to the extent of any insurance with any fire insurance companies directly or indirectly covering upon the same property, whether prior or subsequent hereto in date.' Under the uncontradicted evidence in this case, the plaintiff was carrying. at the time of the fire, insurance with a number of fire insurance companies, to the extent of $15,500, 'on merchandise, consisting chiefly of oils in barrels and tanks, and barrels for same, their own, held in trust or on consignment, and sold. but not removed, contained in brick warehouse building and in tank cars on siding adjoining premises.' The oil, to recover for which this suit is brought, was in tank cars on siding adjoining the premises of the Crew-Levick Company. Consequently, if the policy in suit covered the oil after it was placed by the Pennsylvania Railroad Company upon the siding adjoining the premises of Crew-Levick Company, the insurance was null and void, and your verdict must be for the defendant."

Afterwards, the court being moved for judgment in favor of the defendant non obstante veredicto, these points were affirmed, and judgment entered for defendant as prayed. Upon the assignments of error to this judgment the contention of appellant is that inasmuch as the form attached to the policy states that "it is the true intent and meaning of this policy to fully indemnify the insured for each and every loss by or in consequence of fire, derailment, or collision, * * * anything contained in the printed conditions of this policy to the contrary notwithstanding," the words of said form, "on oil contained in tank cars in transit," must be given a meaning broad enough to cover the oil in the cars after they had been delivered by the transportation company in the yard and alongside the warehouse of the appellant. To do this, we must ignore the interpretation uniformly given to such contracts for inland transportation, in the absence of any express language to the contrary. We, however, think such interpretation is the sound one, and applicable to the facts in this case. The transit of both cars and oil was completed when the delivery was made by the railroad companies into the yard and alongside the warehouse of appellant. That this is true as between the transportation companies and appellant, there can be no question. Their responsibility for the safe conveyance of the merchandise was at an end upon its delivery, as stated. It was then in the control of the consignee, the appellant in this case, and out of the control of the transportation companies; and we think there is nothing in the language of the attached form relied upon by appellant, and quoted above, that ought, in reason, to change this well-settled interpretation to one in favor of the appellant. No authority has been cited, or business usage shown, to warrant this being done.

But the appellant further contends, independently of the force and effect claimed by it for the language in the form, which we have

quoted, that the printed words in the beginning of the marine policy to which said form is attached require that the transit should not be considered as ended and complete until the oil was unloaded from the cars into the warehouse or receptacles of appellant. This so-called stipulation is found in the beginning of the printed marine policy, as hereinbefore set out. As much stress is placed upon this language, it may be again quoted:

"Upon all kinds of lawful goods and merchandise, laden or to be laden on board the good ——, whereof —— is master, for this present voyage, or who-ever else shall go for master in the said vessel, or by whatever other name or names the said vessel, or the master thereof, is or shall be named or called.
"Beginning the adventure upon the said goods and merchandise from and immediately following the loading thereon on board of the said vessel at —— as aforesaid, and, so shall continue and endure until the said goods and mer-chandise shall be safely landed at —— as aforesaid. And it shall and may be lawful for the said vessel, in her voyage, to proceed," etc.

As we have already remarked, it is obvious that this whole print-ed policy is a marine one, and the contract set out, or to be set out when the blanks are filled, refers exclusively to sea, and not to land, carriage. The words relied upon by appellant to modify the mean-ing and change the interpretation that would ordinarily be given to the words "in transit" in the substantive contract for land carriage, attached, are, "and so shall continue and endure until said goods and merchandise shall be safely landed at —— as aforesaid." It is perfectly clear, when read with the context, that these words refer to a cargo to be carried by sea, and not to land carriage. The sub-ject-matter, then, being entirely different, it is hard to see how a stipulation, made expressly as to one kind of service should be made applicable to one entirely different. But, more than this, it is im-possible to avoid the conclusion that the language of the clause just quoted, with the blanks unfilled, is absolutely insensible. The words are unmeaning, so far as this contract goes, and can lend no aid in interpreting completed stipulations. Whether we consider the word "landed" as applicable in ordinary parlance to goods or passengers discharged from land vehicles, or as exclusively appro-priate to the discharge of a cargo or passengers from a ship, we are clearly of opinion, for the reasons stated, that the clause in ques-tion cannot help us in the interpretation of the real contract con-tained in this policy. We quite agree that in the case of a deed or other contract, where the language used in any particular is doubt-ful or of difficult interpretation, it must be taken most strongly against the one who offers the deed or employs the language, and that this rule is applicable in certain cases to the interpretation of insurance policies, as being the language of the insuring company, and not of the insured. This is not true in a case like the present one, where the insured has voluntarily accepted an imperfect docu-ment, containing obviously uncompleted and inapplicable stipula-tions. We think that both parties must be taken to have intended, by leaving the blanks referred to unfilled, that the clauses in which they occur should be nugatory. The doctrine of contra proferentem, so strongly invoked by appellant, cannot, therefore, apply here. In respect to these clauses, no deed is proffered, and no language is

employed by either party to create a contract, or special stipulation in a contract. As said by the court below:

"The object [of the contract] was to protect property on land, not at sea. The word 'landed' had, therefore, no appropriateness. It is impossible to suppose that this was not as apparent to the one party as to the other, or that either of them did not comprehend that the language which really limited the continuance of the risk was that contained in the 'form attached,' viz. 'on oil contained in tank cars in transit.'"

The view taken of this first point reserved and passed upon by the court below renders it unnecessary to consider the second point. For the reasons above stated, the judgment of the court below should be, and is, affirmed.

ACHESON, Circuit Judge (dissenting).    To cover a land transportation risk on oil contained in tank cars, the insurance company chose to adopt a form of policy ordinarily used for marine risks. Stamped across the face of the policy, as issued, are the words:

"The special terms and conditions governing this insurance are set forth in the contract form which is attached within, and signed by L. A. Wight, attorney, and the contents of the same shall supersede anything to the contrary in the printed body of this policy."

The policy is numbered 638,003. It has the heading, "Cargo." Some of the blanks (for example, the time limit) are appropriately filled by writing, and it is signed at the foot. Attached within is the "contract form," recited at length in the opinion of the majority of the court. Stamped on the face of this form are the words, "Attached to and forming part of policy No. 638,003," with the underwritten signature, "L. A. Wight, Attorney." It also concludes with the words, "Attached and forming part of policy No. 638,003 of the British & Foreign Marine Insurance Co., Limited." It thus indisputably appears that the policy which the insurance company prepared and issued consisted of the "printed body" and the attached "contract form," the two together constituting the insurance contract. As we have seen, however, from the recited face memorandum, the contents of the attached "contract form" are to supersede "anything to the contrary in the printed body of the policy." The plain intent is that the provisions of the "printed body" of the policy and those of the attached "contract form" are both to stand, and effect be given to each, unless there is an inconsistency between them, in which case, to the extent of such inconsistency, "the printed body" shall give way to the attached "contract form." By that attached "contract form" the policy is made to cover loss "on oil contained in tank cars in transit, principally from the oil regions in Pennsylvania and New York to various places, and to Seaboard Oil Works, South Chester, Pa., and from Seaboard Oil Works to various places." The reasonable view, I think, is that the transit here contemplated begins when the oil is run into the railroad company's tank cars at the place of shipment, and ends upon its discharge therefrom, without unusual delay, at the place of destination. The tank car is a huge vessel moving on wheels, and the actual delivery of the oil does not occur until it is removed therefrom. The trans-

ported oil bears the same relation to the tank car as the cargo does to the carrying ship. The analogy is so close that the insurance company here used a marine form of policy, and the settled rule with respect to such a policy is that the risk continues until the goods are landed at the usual place. Gracie v. Insurance Co., 8 Cranch, 75, 83, 3 L. Ed. 492; 2 Pars. Mar. Ins. 62; 1 Phil. Ins. § 970.

The case, however, does not rest simply upon the contents of the attached "contract form." In the "printed body of the policy" is this provision:

"Beginning the adventure upon the said goods and merchandise from and immediately following the loading thereof on board of the said vessel at —— as aforesaid, and so shall continue and endure until the said goods and merchandise shall be safely landed at —— as aforesaid."

The parties left this duration clause standing in the body of the policy. Is it for the court to strike it out? Doubtless in the first instance it was framed with reference to a marine risk. The insurance company, however, has seen fit to apply the policy to a case of land transportation. As already shown, the contract of insurance is to be found in the printed body of the policy and the annexment taken together. The language of the duration clause in the body of the policy is fairly applicable to "oil contained in tank cars in transit." That clause is not at all inconsistent with anything contained in the attached "contract form." The two can be read together, and effect given to each. Why should the duration provision in the body of the policy be ignored? It alone expressly defines the beginning and the ending of the risk. There is no warrant that I can see for disregarding it. It is a cardinal rule of construction that effect should be given, if possible, to every part of an instrument. Moreover, it is well settled that, if a policy is so drawn as to be susceptible of two interpretations, that one should be adopted which is the more favorable to the insured. First Nat. Bank v. Hartford Fire Ins. Co., 95 U. S. 673, 24 L. Ed. 563; Thompson v. Insurance Co., 136 U. S. 287, 10 Sup. Ct. 1019, 34 L. Ed. 408; Insurance Co. v. Cropper, 32 Pa. St. 351. I am of opinion that the court below should have decided the question involved in the defendant's first point in favor of the insured.

Upon the question raised by the defendant's second point, no opinion is expressed by the majority of this court. My own judgment is that this question, also, should have been ruled in favor of the insured. The clause in the printed body of the policy here relied on by the insurance company is this:

"This insurance warranted to be in all cases null and void to the extent of any insurance with any fire insurance companies directly or indirectly covering upon the same property, whether prior or subsequent hereto in date."

But the attached "contract form" declares thus:

"It is the true intent and meaning of this policy to fully indemnify the assured for each and every loss by or in consequence of fire, derailment, or collision, not exceeding, however, the sum hereby insured, anything contained in the printed conditions of this policy to the contrary notwithstanding."

It seems to me clear that, under the terms of the contract as expressed in the stamped memorandum on the face of the policy, this special attached provision superseded the clause in the printed body

of the policy touching insurance against fire. I dissent from the judgment of affirmance. I would reverse, and direct entry judgment on the verdict in favor of the plaintiff.