PACIFIC TALL SHIPS COMPANY, an Illinois Corporation, Plaintiff,

v.

KUEHNE & NAGEL INC., a New York Corporation; Blue Anchor Line Division of Transpac Container System Ltd., an Unknown Foreign Entity; Nacora Insurance Brokers Inc., a New Jersey Corporation; Fireman's Fund Insurance Co., a California Insurance Corporation, Defendants.

No. 98 C 2255.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 30, 1999.

Thomas Joseph O'Donnell, Glen Ellyn, IL, Jeanne E. Gettelman, Lemont, IL, for Plaintiff.

Steven Brian Belgrade, John Andrew O'Donnell, Michaela C. Kunc, James Kent Minnette, Belgrade & O'Donnell, Chicago, IL, for Defendants Kuehne & Nagel, Inc., Blue Anchor Line Division of Transpac Container System Ltd.

Philip Gilbert Meyer, Philip G. Meyer & Associates, West Bloomfield, MI, Kenneth Thomas Garvey, Kenneth T. Garvey and Associates, Chicago, IL, for Defendant Nacora Ins. Brokers Inc.

Warren J. Marwedel, Omar S. Odland, Marwedel, Minichello & Reeb, P.C., Chicago, IL, for Defendant Fireman's Fund Ins. Co.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This dispute arises out of the transport of seventy-six model ships. The plaintiff, Pacific Tall Ships Company ("Tall Ships"), pursues recovery of the value of the damaged model ships from the defendants: Kuehne & Nagel, Inc. ("K & N"), Blue Anchor Line Division ("Blue Anchor"), Fireman's Fund Insurance Company ("Fireman's"), and Nacora Insurance Brokers, Inc. ("Nacora"). Presently before the Court are four separate summary judgment motions; one from each defendant. After careful consideration, we deny K & N's partial summary judgment motion, we grant in part and deny in part Blue Anchor's summary judgment motion, and we grant summary judgment in favor of Fireman's and Nacora.

## FACTS COMMON TO EACH MOTION

Because each of the defendants' motions presents arguments unique to itself, we analyze each summary judgment motion separately below. Additionally, we reserve a more detailed description of the facts relevant to each motion. Here, we set forth only the general contours of the case.

Tall Ships hired K & N to arrange the shipment of seventy-six model wooden ships from the Philippines to Lemont, Illinois. K & N, pursuant to its contract with Tall Ships, obtained insurance coverage for the cargo under an open-marine cargo policy issued to K & N by Fireman's Fund. Prior to shipping, K & N erroneously told Tall Ships that United States Customs required fumigation and referred Tall Ships to Mighty Men Fumigators. Mighty Men fumigated the cargo by placing phosphine tablets in the container used to transport the cargo. Three days later, Blue Anchor actually shipped the goods. When the model ships arrived in Lemont, they were completely ruined because the container holding the cargo was not properly ventilated, as required by the fumigation method used by Mighty Men. After Fireman's denied Tall Ships' insurance claim, Tall Ships filed this lawsuit against K & N, Blue Anchor, Fireman's, and Nacora. Nacora is K & N's in-house insurance broker.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A defendant does not need to produce evidence demonstrating the absence of a factual question, but can be discharged by pointing out the absence of evidence to support the plaintiff's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a motion for summary judgment, we must view all of the evidence in a light most favorable to the non-moving party, and draw all inferences in the non-movant's favor. *Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir.1996). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But, if the evidence is merely colorable, is not sufficiently probative, or

merely raises some metaphysical doubt as to the material facts, the court may grant summary judgment. *Id.* at 249–50, 106 S.Ct. 2505. Weighing evidence, determining credibility and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Id.* at 255, 106 S.Ct. 2505.

## I. Tall Ships v. K & N

K & N's sole claim for partial summary judgment rests on a contract term purportedly limiting K & N's potential liability to $50 per shipment, regardless of K & N's performance under the contract. The liability limitation is on the reverse side of K & N's credit application form, which Tall Ships filled out and submitted in 1996, as well as on the reverse side of each invoice K & N sent to Tall Ships. K & N claims that Tall Ships, by signing the credit application, expressly consented to be bound by the terms and conditions of service for each of its shipments. Tall Ships responds that the limited liability provision should not be enforced because (1) Tall Ships never received actual notice of the provision, and (2) K & N effectively waived the provision through its prior course of dealings with Tall Ships. We conclude that a genuine issue exists as to the enforceability of the liability limitation and deny K & N's motion for partial summary judgment.

### A. Facts

K & N argues that Tall Ships consented to the liability limitation when Dennis Egan, Tall Ships' president, signed a two-sided credit application on April 17, 1996. The front side of the credit application contains the following proviso: "CREDIT TERMS & POLICY: I/WE UNDERSTAND AND AGREE TO TERMS AND CONDITIONS OF SERVICE AS STATED ON THE REVERSE SIDE OF THIS CREDIT APPLICATION." (R. 93, Tall Ships Ex. BB, Credit Application (emphasis in original).) The back of the credit application contains the following limitation:

8. Limitation of $50 Per Shipment. The Customer agrees that the Company shall in no event be liable for any loss, damage, expense or delay to the goods resulting from the negligence or other fault of the Company for any amount in excess of $50.00 per shipment (or the invoice value, if less) and any partial loss or damage for which the Company may be liable shall be adjusted pro rata on the basis of such valuation.

K & N also points to evidence of over twenty prior transactions with Tall Ships, where for each transaction Tall Ships was given an invoice containing an identical liability limitation. (R. 93, Tall Ships Ex. JJ.)

Tall Ships counters that they were not aware of the liability limitation provision. Specifically, Tall Ships claims it did not receive the invoice for the shipment in question until after the shipment was made. Regarding the credit application and previous invoices, Tall Ships maintains that K & N never told it about the liability limitation provision; it did not independently discover the limitation; and, in fact, K & N generally faxed only the front side of the invoices to Tall Ships.

Additionally, Tall Ships submits evidence demonstrating that, on three prior occasions, it presented damage claims to K & N, and K & N never invoked the $50 limitation. Each of the three prior damage claims was for an amount far higher than $50: the claims were for $400, $641.24, and $2,800. The record is unclear as to the resolution of the claims, but contains a flurry of documents regarding these claims in which K & N does not once invoke the liability limitation. According to Tall Ships, this "prior course of dealings" shows that K & N effectively waived enforcement of the term limiting its liability to $50.

### B. Analysis

 Parties to a contract may agree to limit the liability of one party, and courts will enforce such agreements. For example, a court in this district enforced a contractual term identical to that at issue

in this case, and limited K & N's liability to $50 based on the parties' prior course of dealings. *Independent Mach., Inc. v. Kuehne & Nagel, Inc.*, 867 F.Supp. 752 (N.D.Ill.1994); *see also Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391 (7th Cir.1992) (enforcing contractual term limiting shipping agent's liability to $50 per package). In both *Capitol Converting* and *Independent Machinery*, the parties had engaged in numerous prior transactions, each of which was governed by a contract containing a provision limiting the shipping agent's liability. *Capitol Converting*, 965 F.2d at 395 (Capitol "had engaged in 'hundreds of transactions' with LEP" and "each invoice it received from LEP (and paid) contained the same term limiting LEP's liability."); *Independent Mach.*, 867 F.Supp. at 764 ("[T]he shipment . . . was not an isolated transaction, but rather the most recent of a series of deals in which the same terms had appeared on prior invoices."). Thus, in these two cases, a prior course of dealings between the parties established the shipper's knowledge of the contractual term and its enforceability in the disputed case.

■ Applying these standards to this case, Tall Ships has established a genuine issue as to the enforceability of K & N's liability limitation provision. Although K & N relies on its twenty prior transactions with Tall Ships to establish the contractual term, Tall Ships has submitted evidence that its copies of the invoices for those prior transactions did not actually contain the limitation provision because K & N faxed only the front side of those invoices to Tall Ships. This evidence is sufficient to create a factual issue about whether the parties' prior course of dealings actually included the contractual term at issue.

Furthermore, even if the invoices for the twenty prior transactions each contained the provision and Tall Ships knew about it, Tall Ships presents evidence that K & N waived enforcement of the provision by failing to invoke it when Tall Ships submitted its three damage claims, each in excess of $50. Tall Ships may have relied on K &

N's failure to invoke the provision when deciding to hire K & N to coordinate this shipment.

For these reasons, we deny K & N's motion for partial summary judgment.

## II. Tall Ships v. Blue Anchor

Tall Ships' complaint seeks recovery from Blue Anchor under the Carriage of Goods by Sea Act ("COGSA") 46 U.S.C. § 1300, *et seq.* It believes that Blue Anchor is liable for its losses either directly as a carrier, or indirectly as K & N's principal. Blue Anchor seeks summary judgment on the grounds that Tall Ships cannot make out a prima facie case under COGSA, and that Tall Ships forfeited any agency claim by failing to include it in its complaint. Blue Anchor maintains that Tall Ships cannot amend its complaint via its summary judgment brief. Additionally, it argues that K & N's action in having the cargo fumigated was not within the scope of its agency to Blue Anchor and, therefore, Blue Anchor cannot be liable under an agency theory. We conclude that Tall Ships has established a genuine issue of fact as to the scope of K & N's agency and, thus, a material issue about Blue Anchor's liability for the damage to the model ships.

### A. Facts

In January 1993, K & N and Blue Anchor signed an agency agreement. (R. 92, Tall Ships Ex. V, Agency Agreement.) Under the terms of the agreement, K & N agreed to "solicit and secure conventional and containerized cargo for transport by the Principal [Blue Anchor]." (*Id.* at ¶ 1.2.) The agreement authorizes K & N to "[o]rganize, coordinate, negotiate and quote in consultation with the Principal where necessary for inland transport and ancillary services," (*id.* at ¶ 2.8), and "furnish the Principal with all information regarding rates and regulations existing in all the ports in the Area," (*id.* at ¶ 1.4). The agreement defines "the Area" as "the country of United States of America." (*Id.* in preamble.)

Tall Ships maintains that K & N's erroneous instruction to fumigate was within the terms of K & N's agency and, thus, Blue Anchor is liable for its loss. Specifically, Tall Ships claims that K & N's advice regarding United States Customs regulations was an "ancillary service" authorized by Blue Anchor in paragraph 2.8. Tall Ships also asserts that the advice concerned "regulations existing" in American ports and, thus, falls within the language of paragraph 1.4. Finally, Tall Ships argues that a sign in K & N's offices identifying K & N as Blue Anchor's agent led Tall Ships to believe, reasonably, that K & N was Blue Anchor's agent for all purposes.

### B. COGSA Claim

■ We need not dwell long on Tall Ships' COGSA claim. Tall Ships concedes that the cargo damage was caused by the fumigation chemicals, which were introduced into the cargo container at least three days before Blue Anchor received it for shipment. Obviously, then, Tall Ships cannot establish that the cargo was delivered to Blue Anchor in good condition, as required to recover damages under COGSA. *See, e.g., Daewoo Int'l (Am.) Corp. v. Sea–Land Orient Ltd.,* No. 98–6171, 1999 WL 1050704, at *2 (3d Cir. Nov. 19, 1999); *Hale Container Line, Inc. v. Houston Sea Packing Co.,* 137 F.3d 1455, 1468 (11th Cir.1998); *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration,* 137 F.3d 94, 98 (2d Cir.1998).

### C. Agency Claim

■ There is really no question that Tall Ships adequately alleged a cause of action against Blue Anchor as K & N's principal: it did. (R. 1, Compl. at ¶ 11.) Furthermore, K & N's advice to Tall Ships regarding fumigation was within the scope of its actual authority to act on Blue Anchor's behalf. Although the advice probably was not within the meaning of "ancillary services" (when read in the context of paragraph 2.8, "ancillary services" apparently refers to land-based transport, as opposed to marine transport), the purpose

of K & N's obligation to inform Blue Anchor of United States regulations is "to enable the Principal to comply with all rules and regulations . . . imposed by any authority in the Area." (R. 92, Tall Ships Ex. V, Agency Agreement at ¶ 1.4.) K & N's duties on behalf of Blue Anchor thus included assuring that its customers comply with United States Customs regulations. Here, although the fumigation advice was erroneous, K & N informed Tall Ships that U.S. Customs requires fumigation. The advice was given for the purpose of assuring Tall Ships' compliance, and thus Blue Anchor's compliance, with "regulations . . . imposed by [an] authority in the Area."

For this reason, we grant Blue Anchor's summary judgment motion with respect to Tall Ships' COGSA claim, but deny it with respect to the agency claim.

### III. Tall Ships v. Fireman's

Tall Ships sues Fireman's for wrongfully denying its insurance claim. The relevant facts are as follows.

### A. Facts

Tall Ships hired K & N to handle all of its shipping needs, including procuring insurance for its shipments. Fireman's issued a standard open-marine cargo policy to K & N. Under this policy, K & N is the assured and places insurance with Fireman's for its customers, the insureds. As relevant here, the policy covers losses occurring "in transit," unless the damage is caused by inadequate packaging. (R. 92, Tall Ships Ex. L, Open Marine Ins. Portfolio ("Policy"), at § 1, ¶ 6 (warehouse-to-warehouse clause) and § 1, ¶ 19 (incorporating Institute Cargo Clauses); R. 72, Fireman's Ex. J, Institute Cargo Clause ("ICC"), at ¶ 4.3 (excluding loss from inadequate packaging).) Additional coverage, if desired, must be requested in writing. The shipment at issue here was insured under the terms of K & N's policy.

In preparing the cargo for transit, Tall Ships placed the seventy-six model ships in

a single container that was located on the street outside of its Philippines facility. The fumigator placed a can containing forty phosphine tablets inside the container with the cargo. The container was then sealed by Tall Ships' employees, who stood guard over the container until a trucker picked it up later that day. The cargo container should have been vented 72 hours after the fumigation chemical was introduced; because it was not, the model ships were ruined.

Tall Ships notified K & N regarding the damage and filed an insurance claim for the damage. Fireman's denied the claim, and Tall Ships initiated this lawsuit to recover insurance proceeds from Fireman's. Fireman's seeks summary judgment arguing that the damage to the model ships is not covered by the insurance policy because it occurred before transit began and, even if the damage occurred during transit, it falls within the "inadequate packaging" exclusion.

## B. Analysis

Fireman's presents two basic arguments in support of its motion for summary judgment. First, it argues that Tall Ships' loss occurred prior to transit. According to Fireman's, the loss occurred when the phosphine tablets were placed in the cargo container and the container was sealed. Fireman's asserts that, because the fumigation took place while the cargo was in Tall Ships' control, the cargo had not commenced transit as required under the warehouse-to-warehouse clause of K & N's policy. Second, Fireman's argues that, even if the damage occurred during transit, it fell within the policy's "inadequate preparation" exclusion, and thus was not covered. The Court agrees on both points.

### 1. The Warehouse Clause and Commencement of Transit

The policy at issue here is an "open-marine cargo policy" typically used in the freight forwarding business. An open-marine cargo policy "is a prospective policy that requires notice from the insured [via the assured] to the insurer so that it can be entered on the policy, which is open to receive them." Sorkin, *Goods in Transit* § 42.08 (1999) (quotations omitted). The assured binds the insurer by issuing a certificate of insurance for each specific shipment including the value of the shipment, vessel name, route, etc. *See Greene v. Cheetham*, 293 F.2d 933, 935 (2d Cir.1961). Fireman's insurance policy covers cargo from warehouse to warehouse: in other words, it attaches when the cargo "leaves the warehouse for the commencement of transit." (R. 92, Tall Ships Ex. L, Policy at § 1, ¶ 6.) Assuming that the damage occurred to the model ships when the fumigation occurred, the question is when transit commenced.

Courts have held that transit involves movement. *See Hartford Cas. Ins. Co. v. Banker's Note, Inc.*, 817 F.Supp. 1567, 1573 (N.D.Ga.1993) ("Property is considered in transit when it is moving from one location to another"); *San–Nap–Pak Mfg. Co. v. Firemen's Ins. Co. of Newark, N.J.*, 47 N.Y.S.2d 542 (City Ct. N.Y.1944) ("Transit in common speech is the act or process of causing to pass from one place to another."); *see also* Sorkin, *Goods in Transit* § 43.04[2] (1999) ("In transit implies a continuity of movement of cargo and not storage."). Cargo cannot simultaneously be "in preparation for transit" and "in transit." *See Kessler Export Corp. v. Reliance Ins. Co.*, 207 F.Supp. 355, 358 (E.D.N.Y.1962); *Brammer Corp. v. Holland–America Ins. Co.*, 34 Misc.2d 337, 228 N.Y.S.2d 512 (N.Y.Sup.Ct.1962); Donald T. Rave, Jr. and Stacey Tranchina, *Marine Cargo Insurance: An Overview*, 66 TUL. L. REV. 371, 375–76 (1991) (surveying relevant case law and concluding that "[t]he general rule appears to be that mere preparation of a shipment for transit, no matter how complete, does not trigger coverage under a cargo policy. Transit will not be considered to have commenced unless the shipment has been moved to a point beyond the control of the seller.").

In *San–Nap–Pak*, the cargo at issue was 480 cartons of toilet tissue, which was load-

ed on to the plaintiff's tractors and trailers. *See San–Nap–Pak,* 47 N.Y.S.2d at 543. The tractors and trailers were left on a lot adjacent to the plaintiff's factory. *Id.* The next day a flood inundated the trailers and damaged the cargo. *Id.* The court held that transit had not commenced because although it was fully prepared, the cargo had not actually made any movement toward its intended destination. *Id.* at 545. Similarly, in *Kessler,* the defendant arranged for a shipment of sunglasses to Morocco. *See Kessler,* 207 F.Supp. at 357. After the goods were loaded into the defendant's truck, the truck was left in the plaintiff's warehouse for the weekend. *Id.* Over the weekend the truck with the cargo was stolen. *Id.* The court held that the goods had not commenced transit because they never left the plaintiff's control. *Id.*

K & N delivered a container to the street outside of Tall Ships' Philippines warehouse. Tall Ships' employees placed the cargo into the container. The fumigator placed a can containing forty phosphine tablets into the container, which Tall Ships then sealed. Tall Ships affixed the U.S. Customs seal and stood guard until a trucker came to pick up the container. Thus, although the fumigation took place outside Tall Ships' warehouse, the cargo had not yet commenced transit. Once fumigated, the cargo sat in front of Tall Ships' warehouse. As in *San–Nap–Pak* there was no "movement to the points of [the cargo's] intended delivery." *See San–Nap–Pak,* 47 N.Y.S.2d at 545. Because the model ships remained in Tall Ships' control until hours after the fumigation, the cargo had not yet begun transit; instead it was "there awaiting the beginning of [ ] transit." *Id.* The fact that the packaging was sealed after the fumigation underscores the point that transit had not commenced; cargo cannot simultaneously be prepared for transit and in transit.

Tall Ships argues that an insurance policy is a contract of adhesion and that any ambiguity should be construed in favor of the insured. According to Tall Ships, because Fireman's never defines "transit" in its policy, the clause is ambiguous, and the Court should therefore deny Fireman's motion for summary judgment. However, standard clauses are generally not read so harshly. *See* Sorkin, *Goods in Transit* § 56.11 (1999) (discussing marine insurance policies as contracts of adhesion). Warehouse-to-warehouse clauses are standard in policies covering marine cargo. A considerable amount of case law interprets such clauses, and precisely when transit commences. *See, e.g., Kessler Export Corp.,* 207 F.Supp. 355; *Brammer Corp.,* 34 Misc.2d 337, 228 N.Y.S.2d 512; *San–Nap–Pak,* 47 N.Y.S.2d 542. In other words, the meaning of "in transit" in the context of warehouse-to-warehouse clauses is not ambiguous.

 Tall Ships also argues that K & N was acting as Fireman's agent, and, therefore, that Fireman's should be liable for K & N's negligence in ordering that the cargo be fumigated. "In examining agency relationships Illinois law focuses on the agent's conduct rather than on his or her title." *Perzy v. Intercargo Corp.,* 827 F.Supp. 1365, 1373 (N.D.Ill.1993). There may be instances where an insurance broker, in this case K & N, is an agent of both the insurer and the insured. *Id.* Here, however, the fumigation was done at K & N's direction to protect Tall Ships' interest, not Fireman's. The fumigation was directed according to a mistaken belief that it was required by U.S. Customs; this has nothing to do with insurance. Moreover, there is no evidence that Fireman's played any role whatsoever in requesting or obtaining the fumigations. Thus, K & N was not Fireman's agent when it arranged for the fumigation.

### 2. Inadequate Preparation

 Even if the damage occurred at some point during transit, Tall Ships still could not recover under the terms of Fireman's policy. The policy is an all-risk policy and must be read as a whole, including exclusions. *See* Sorkin, *Goods in Transit,* § 42.03[1] (1999). Once a plaintiff

has shown the existence of an all-risk policy and a fortuitous loss, an insurance company can escape liability by demonstrating that the loss occurred within an exclusion in the policy. *See Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 999 (2d Cir.1974). Assuming Tall Ships can meet its obligations, Fireman's contends that the loss falls within Exclusion 4.3:

> In no case shall this insurance cover ... loss damage or expense caused by insufficiency or unsuitability of packing or preparation of the subject matter insured (for the purpose of the Clause 4.3 "packing" shall be deemed to include stowage in a container or a liftvan but only when such stowage is carried out prior to attachment of this insurance or by the Assured or their servants).

(R. 72, Fireman's Ex. J, ICC.)

Few cases address the adequacy of packaging in terms of insurer liability. However, several courts have addressed the issue in the context of the Carriage of Goods at Sea Act (COGSA), 46 U.S.C.App. § 1304(2)(n). While not dispositive, these cases illustrate an accepted meaning of the phrase "inadequate preparation." For example, in *Bache v. Silver Line,* 110 F.2d 60 (2d Cir.1940), the court held that a carrier was not to be liable for damage to a rubber shipment because of inadequate preparation. In ruling for the defendant, Judge Learned Hand held that "if goods, as they are wrapped or cased, are not fitted to endure the ordinary hazards of the voyage, the ship is not liable" because the goods are not adequately prepared. *Id.* at 61. Similarly, in *The Rita Sister,* 69 F.Supp. 480 (E.D.Pa.1946), the plaintiff shipped two thousand cases of brandy which were received by the carrier in good condition. *Id.* at 481. During transit, however, twenty cases were damaged. *Id.* The record indicated that the cases were handled and stowed in a careful manner, but that the packaging was "weak" because it allowed

the bottles to break. *Id.* For this reason, the carrier was not liable for the damage.

In another brandy case, *Kasser Distillers Prod. Corp. v. Companhia De Navegacao Carregadores Acoreanos,* 76 F.Supp. 796 (S.D.N.Y.1948), the court found that "[t]he breakage was clearly within the [packaging]." *Id.* at 798. The court held that it did not matter if customary packaging methods were used because that fact was not probative of the adequacy of the particular packaging. *Id.*

Here, the damage was, as in *Kasser,* within the packaging. There is no dispute that the botched fumigation destroyed the model ships. The fumigation was done in preparation for transit. Additionally, the container should have been ventilated 72 hours after it was fumigated, but it wasn't. In other words, the packaging of the cargo was faulty; it contained corrosive fumes. Thus, the damage resulted from the preparation and packaging of the cargo and, for this reason, was not covered by the terms of the insurance policy.

Tall Ships argues, without citing any case law, that the packaging exception applies only to *structural* damage. Tall Ships contends that the packaging here was sufficient to keep the models from shifting inside the container, and that nothing structural in the packaging caused the damage. Although the cases analyzing inadequate packaging have indeed dealt with damage caused by some structural defect, the exclusion at issue here is not limited solely to structural damage, or any other particular cause. Here, the model ships were damaged by the fumigation tablets placed in the cargo container; the fumigation tablets were part of the packaging. Thus, the damage was the result of inadequate packaging.[1]

Thus, there is no genuine issue of fact that Fireman's is liable on its insurance

---

1. Since the Court grants Fireman's motion for summary judgment on the above grounds, it does not reach Fireman's other defenses— inherent vice and attempt to bind coverage after a known loss.

policy to Tall Ships and we grant Fireman's summary judgment motion.

## IV. Tall Ships v. Nacora

Finally, Tall Ships sues Nacora for breach of duty under maritime contract, breach of contract to procure marine insurance, negligent failure to procure insurance, and breach of fiduciary duty. Nacora is K & N's in-house insurance broker. Tall Ships "enlisted the aid of [K & N], because of their claim that they were a full service shipper with an in-house insurance broker, Nacora." (R. 87–1, Tall Ships' Resp. to Nacora's Mot. at 3.) But Tall Ships did not discuss insurance for the seventy-six model ships with Nacora; rather, it made arrangements for insurance with K & N. Nor is there any other evidence of a relationship between Tall Ships and Nacora. Instead, Dennis Egan, President of Tall Ships, stated in his deposition that he believed that Nacora and K & N were one and the same, and that when he was talking to K & N he thought he was talking to both.

The difficulty here is that, although Nacora is an insurance broker, K & N was Tall Ships' insurance broker: Tall Ships contracted with K & N to make all of its arrangements for shipping, including insurance. Thus any contractual or fiduciary duty owed Tall Ships by an insurance broker was owed by K & N, not Nacora. Moreover, even assuming that Nacora failed in some duty to Tall Ships, the insurance it would have procured would not have covered this particular loss.

### A. Breach of Contract and Breach of Contract to Procure Insurance

To state a claim for breach of contract, Tall Ships must allege that a contract between it and Nacora existed, that Tall Ships performed their contractual obligations, that Nacora breached the contract, and that Tall Ships suffered damages due to the breach. *See Derson Group, Ltd. v. Right Mgmt. Consultants*, 683 F.Supp. 1224, 1230 (N.D.Ill.1988).

Tall Ships offers no evidence that a contract existed between it and Nacora; the only evidence it submits goes to Dennis Egan's state of mind. For instance, Egan thought that he was dealing with Nacora; he thought Nacora and K & N were one and the same. Yet in his affidavit Egan acknowledges that the two companies are in fact separate entities. Egan also testified that when negotiating insurance he never spoke to anyone from Nacora. Instead, he discussed insurance with a K & N employee.

This evidence cannot establish the existence of a contract between Tall Ships and Nacora. There is no evidence of an offer by Nacora, or acceptance by Nacora of an offer by Tall Ships. Because Tall Ships has not shown the existence of a contract between it and Nacora, it has not met its threshold burden, and its breach of contract claims cannot prevail.

### B. Breach of Fiduciary Duty

Tall Ships also claims that Nacora breached its fiduciary duty to Tall Ships. To succeed on this claim, Tall Ships must prove the existence of a fiduciary relationship. *See Farmer City State Bank v. Guingrich*, 139 Ill.App.3d 416, 94 Ill.Dec. 1, 487 N.E.2d 758, 763 (1985). A fiduciary relationship may be presumed by virtue of the parties' relationship. *Id.; see also State Sec. Ins. Co. v. Frank B. Hall & Co.*, 258 Ill.App.3d 588, 196 Ill.Dec. 775, 630 N.E.2d 940, 945 (1994). For example, an agency relationship establishes a fiduciary relationship as a matter of law. *State Sec. Ins.*, 196 Ill.Dec. 775, 630 N.E.2d at 945.

Nacora is an insurance agent and Tall Ships is an insured; this appears to be the basis of Tall Ships' fiduciary duty claim. But, as stated above, K & N was Tall Ships' insurance broker, and Tall Ships has not produced any evidence that it had any sort of relationship with Nacora. Although Tall Ships claims that it regarded K & N and Nacora as one, this evidence, of course, does not establish that they

were one, or that K & N could somehow silently bind Nacora as a fiduciary to Tall Ships. The fiduciary relationship, if any, lies between Tall Ships and K & N.

### C. Negligence

 To state a cause of action for negligence, the plaintiff must show that the defendant owed it a duty of care, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury. *See Mt. Zion State Bank & Trust v. Consol. Communications, Inc.*, 169 Ill.2d 110, 214 Ill.Dec. 156, 660 N.E.2d 863, 867 (1996). Here, even if Tall Ships could demonstrate that Nacora owed it a duty, Tall Ships would not prevail because it cannot show that Nacora's failure to procure insurance was the proximate cause of Tall Ships' loss.

As we held above, Tall Ships' loss occurred outside of the terms of the standard marine cargo policy and, thus, was not covered by that policy. Tall Ships presents no evidence that it requested coverage beyond that provided by the standard marine policy. Thus, even if Nacora had a duty to obtain insurance for Tall Ships, it would not have been under any duty to obtain extraordinary coverage. Because Nacora would have gotten the same type of insurance that K & N did in fact obtain, Tall Ships loss would not have been covered under a Nacora-obtained policy either. Therefore, Tall Ships cannot show that Nacora's failure to obtain insurance caused its loss.

Thus, there is no genuine issue of material fact that Nacora is liable for Tall Ships' losses, and we grant Nacora's summary judgment motion.

### CONCLUSION

For the foregoing reasons, K & N's partial summary judgment motion is denied. (R. 56–1.) We grant in part and deny in part Blue Anchor's summary judgment motion. (R. 66–1.) We grant the summary judgment motions of Fireman's and Nacora. (R. 70–1; R. 59–1.)

Also pending are motions by Fireman's and Nacora to strike portions of Tall Ships' response briefs for failing to comply with the local rules and for violating counsel's ethical obligations, and a motion by Tall Ships to strike Nacora's motion to strike. Although the defendants' points are well taken, given our ruling, their motions are denied. (R. 98–1; R. 102–1.) Tall Ships' motion to strike is dismissed as moot. (R. 112–1.) However, we admonish in the strongest possible terms Tall Ships' attorneys to alter their litigation strategy—particularly their use of inflammatory and wholly inappropriate characterizations of the defendants [2] in lieu of well-reasoned legal positions—or face possible future sanctions.

A final pretrial order in this case will be due on January 5, 2000. The remaining issues in this lawsuit are hereby set for trial on January 24, 2000, at 10:00 a.m. A status hearing will be held in open court on December 21, 1999 at 9:45 a.m.

---

2. For example, Tall Ships compares one of Nacora's officers to a Nazi minimizing the Holocaust during the Nuremberg Trials. (R. 87–2, Tall Ships' Resp. Mem. at 6.)